# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS

In re:

WASTEPLACE, LLC,

Case No. 23-10768
Chapter 11 Proceedings

Debtor.

Hon. Shad Robinson

## PLAN OF REORGANIZATION
### (as modified on January 25, 2024)

WastePlace, LLC, ("**WastePlace**," and as a Subchapter V, Chapter 11 debtor-in-possession, the "**Debtor**"), by and through its undersigned counsel, Michael Best & Friedrich LLP, proposes the following Plan of Reorganization pursuant to 11 U.S.C. § 1189.

## I. Debtor's Statements Pursuant to § 1190(1) of the Code:

### A. Description and History of the Debtor's Business

The Debtor was founded in 2016 by Rachel and Gary LaBreck. The concept behind WastePlace is to provide an online marketplace where businesses can post their waste and recycling needs and receive competitive bids from third-party waste haulers. The platform enables national, regional, and smaller local haulers to compete equally for customers. WastePlace provides its users with a transparent platform, giving haulers and end-users access to a wider network for overall cost savings. The Debtor has contractual relationships with end-users, as well as the haulers that service each customer location. Most customers execute long-term contracts from 1 to 3 years, which provides the Debtor with a steady, known income stream. The Debtor's assets consist mainly of intellectual property, customer contracts, relationships, and know-how of the platform that it has developed. Otherwise, the Debtor has no real property and only nominal amounts of personal property, cash, or other assets.

The Debtor is governed by a board of Managers, which are elected by the Members of the Debtor. Except for major decisions (sale of the company or amending the operating agreement), the board of Managers is responsible for the day-to-day operations of the business. As of the Petition Date, the Managers consisted of Gary LaBreck, Rachel LaBreck, Trevor Taylor, and William McCann. (*See* Docket No. 25, p. 44.) The Debtor's

Members consist of approximately forty-five (45) separate shareholders in the following categories:

**(1) Preferred Stock**.

    a. *Member Interest Units*. Approximately 72 separate issuances for 184,626,522 units outstanding. Member Interest Units were issued to investors who contributed investment money on a pre-Petition Date basis to WastePlace in exchange for an ownership interest in the company. The total capital raised through the issuance of Member Interest Units from 2019 through 2022 was $2,982,626.50.

    b. *Class C Units*. Approximately 18 separate issuances totaling 14,731,986 units outstanding. Class C Units were issued to investors who contributed investment money on a pre-Petition Date basis beginning in April of 2023 to help fund WastePlace's operations, in exchange for an ownership interest in the company. The total capital raised through the issuance of Class C Units from April of 2023 through August of 2023 was $780,795.35.

**(2) Common Stock**.

    a. *Class B Incentive Units*. Approximately 5 separate issuances totaling 3,946,901 units outstanding. Class B Units were issued to certain employees and contractors as in-kind exchanges for valuable non-cash contributions to WastePlace's pre-Petition Date operations.

The Debtor also entered into convertible promissory notes with William Henry Agency, LLC ("**WHA**") and RMS LMB WP Holdings, LLC ("**RMS**") in the initial principal amounts of $205,731.51 and $1,000,000, respectively.

The note with WHA remains outstanding and is scheduled as a secured claim against the Debtor based on WHA's security agreement with the Debtor. (*See* Docket No. 25, p. 9.) As a result of an objection filed by RMS (*see* Docket No. 50), the Debtor is assessing the filing of WHA's UCC-1 against WastePlace in February of 2023, which is within a 1-year lookback period for insider preferences under 11 U.S.C. § 547(b). WHA maintains that it is not an "insider" as that term is defined in the Code (*see* Docket No. 60), however Tim Dunn, who is a principal owner of WHA, held a position on WastePlace's board prior to the Petition Date. To resolve the dispute and avoid further litigation on the issue, the Debtor's Plan proposes a compromise of the WHA Claim as set forth in Section 4.1 of the Plan.

Pre-petition, RMS called its convertible note in default against WastePlace and in 2022 filed suit against WastePlace in Travis County, Texas (Case No. D-1-GN-22-002145)

for failing to repay RMS' note. Despite WastePlace's attempts to resolve the litigation amicably outside of court, ultimately, the RMS note was reduced to a judgment against WastePlace on July 31, 2023, in a total amount of $1.12 million (plus interest and certain fees). In light of the judgment and a tax levy initiated by the Texas Comptroller, the Debtor sought bankruptcy relief to protect its assets and restructure its debts through this Plan.

The Debtor's Plan proposes to raise additional capital to fund the payments that will be due under the Plan, including a distribution to creditors upon the occurrence of the Effective Date. At this time, the Debtor continues to receive interest form several investors and believes that it will be able to raise sufficient funding to support this Plan, continue to develop its products, and grow its business in accordance with its strategic plan to maximize value to its stakeholders.

## B. Liquidation Analysis

Under 11 U.S.C. § 1190(1)(B), the Plan must include a liquidation analysis. Unless each Holder of a claim or interest accepts the Plan, the Court must find, pursuant to 11 U.S.C. § 1129(a)(7), that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as they would receive in a hypothetical Chapter 7 liquidation scenario.

The Liquidation Analysis, attached as **Addendum 1**, outlines a hypothetical liquidation scenario based on the Debtor's projected assets and liabilities as of the Effective Date. The liquidation values were prepared internally by the Debtor and reflect the Debtor's best estimate as to what amounts would be derived from the liquidation of the Debtor's scheduled assets. Notably, the "Scheduled Value" for the Debtor's furniture, fixtures, equipment, other intangibles & IP, and inventory reflect the book value for such items.

The Liquidation Analysis also reflects the Debtor's review of potential avoidance actions, preferences, and other claims. In particular, after further review of WHA's secured claim, the Debtor believes that the security interest of WHA (which was perfected in February of 2023) may potentially be avoidable under 11 U.S.C. § 547, but such avoidance is not guaranteed nor would it be without additional cost to the Debtor. Other than the WHA lien issue, the Debtor believes that no other avoidance actions exist that would provide any net meaningful benefit to the estate; therefore, the Debtor values such claims as $0.00.

Finally, although the Debtor had approximately $34,000 of cash on hand as of the Petition Date, $24,335 of that cash has been consumed by a payment made by the Debtor to the Texas Comptroller to satisfy certain pre-Petition Date franchise taxes. (*See* Docket No. 27.) The Debtor has also continued operations and payment of operating expenses

throughout the course of this Case, and the balance of cash that would be available for distribution if this case were converted to Chapter 7 would be nominal without additional capital raises that are anticipated as part of the Plan.

In its Schedules, the Debtor has $205,731 of total debt listed on Schedule D (which the Debtor listed as secured, but such security interests may be avoidable). The Debtor scheduled $152,532.74 of priority unsecured debt (of which $24,335 has already been paid to the Texas Comptroller; however, the Texas Comptroller has filed a proof of claim in this Case in the filed amount of $126,239.17 for unpaid sales and use taxes, asserting that it is also a secured tax lien against the Debtor. As such, the Debtor's Plan (and Liquidation Analysis) treat the Texas Comptroller's claim as Secured. Lastly, there are $1,843,685 of nonpriority general Unsecured Claims against the Debtor. As the Liquidation Analysis indicates, in a hypothetical liquidation scenario, the liquidation of the Debtor's assets would result in a distribution to unsecured creditors of $0.

Under the terms outlined in this Plan, the Debtor's Secured Creditors, Administrative Claim Holders, and Creditors holding priority Claims will be paid in full. Additionally, the Debtor estimates that General Unsecured Creditors will receive a Pro Rata distribution of a Reorganization Fund of approximately $150-200,000, which represents more than parties would receive in a liquidation scenario. As explained further below, Holders of Equity Interests are being asked to participate in an open-ended equity raise, the aggregate sum of which will constitute the Reorganization Fund.

Based on the information to date, the Debtor believes that a cash infusion of no less than approximately $150-200,000 will occur as a result of the Plan. Accordingly, the Debtor submits that any Creditor who does not accept this Plan will receive at least as much under the Plan as they would in a Chapter 7 liquidation.

### C.     Ability to Make Future Plan Payments and Operate Without Further Reorganization

As a start-up with developing technology, the Debtor is not currently profitable through its operations alone. It has historically relied on capital raises to support its operations and will continue to do so after the Confirmation Date. The Debtor has not previously generated a profit; however, it expects to begin generating positive cash flow by mid-2024, as set forth in its Projections attached as **Addendum 2**.

After the commencement of this Case, the Debtor's Board supported and approved this Plan which calls for additional capital contributions into the Reorganized Debtor in an effort to emerge from bankruptcy and continue viable operations on a post-Effective Date basis. Accordingly, a majority of the Board approves the submission of this Plan, under which all Equity Interest Holders are requested (but not required) to

participate. In consideration of such contributions, participating Equity Interest Holders will receive Preferred Shared of Class C Units in the Reorganized Debtor.

As the Projections demonstrate, the Debtor's Plan provides that additional capital will be raised from (a) cash paid by WHA pursuant to Section 4.1 of the Plan, and (b) cash paid by Holders of Equity Interests who elect to participate in the equity raise for Class C Units. These cash infusions, coupled with the revenue that the Debtor projects it will continue to make from its operations, will support Plan payments and ongoing expenses after the Effective Date. In the Debtor's expected scenario, the distribution afforded to Class 4 Creditors would be their proportionate share of the Reorganization Fund through the Plan, as opposed to $0 of potential distribution in liquidation.

The Debtor does not anticipate any material tax consequences as a result of the Plan. Section 108(a)(1)(A) of the Internal Revenue Code excludes discharged indebtedness from gross income if the discharge occurs in a title 11 case; however, certain tax attributes of the Debtor may be affected.

Lastly, the Plan provides a Rights Offering to existing Holders of Equity Interests pursuant to 11 U.S.C. § 1145. The Debtor's rights offering is exempt from applicable securities laws because the securities are issued (i) pursuant to the Plan, (ii) by the Debtor and/or Reorganized Debtor, and (iii) are in exchange for claims against or interests in the Debtor. Accordingly, the Debtor is not offering or selling new securities that would require registration with the Securities & Exchange Commission.

Creditors and Holders of Equity Interests are urged to consult with any applicable tax expert or attorney to analyze any potential tax effects on them as a result of the Plan.

**II.    Debtor's Plan of Reorganization:**

**ARTICLE I**
**DEFINITIONS**

Unless the context otherwise requires, the terms below shall have the following meanings wherever capitalized in the Plan. Defined terms shall have the same meaning in both the singular and plural forms unless the context otherwise requires. Any term used in the Plan that is not defined here, but that is defined in the Code, shall have the meaning assigned to that term in the Code.

**1.1**    *Addendum* shall mean any additional material that is attached to the Plan, as may be amended prior to the Confirmation Date.

**1.2**    *Allowed* **or** *Allowed Claim* shall mean any Claim either (a) with respect to which a proof of Claim has been filed with the Court on or before the date fixed as

provided by the Court pursuant to Rule 3003; or (b) scheduled in the list of creditors prepared and filed pursuant to Rule 1007(b) and not listed as $0, disputed, contingent, or unliquidated; and for either (a) or (b), any Claim for which no objection has been filed by the deadline fixed by Rule 3007 or by a Court order, or any Claim for which any such objection has been resolved by an order no longer subject to appeal or for which no appeal is pending.

      **1.3** *Allowed Equity Interest* shall mean any Equity Interest, or a portion thereof, to the extent that it is Allowed pursuant to the Plan.

      **1.4** *Allowed Priority Claim* shall mean a Claim, or a portion of a Claim to the extent that it is allowed, that is entitled to priority pursuant to § 507(a).

      **1.5** *Allowed Secured Claim* shall mean an Allowed Claim secured by a valid and enforceable Lien, security interest, mortgage, or other recognized interest in property in which the Debtor has an interest, which is not void or voidable under any state or federal law or subject to set off under § 553, but only to the extent of the Claim's value pursuant to § 506(a). The portion of an Allowed Claim that is not an Allowed Secured Claim shall be an Allowed Unsecured Claim except as otherwise provided for herein.

      **1.6** *Allowed Unsecured Claim* shall mean any Allowed Claim that is not an Allowed Priority Claim or an Allowed Secured Claim.

      **1.7** *Ballot* means each of the ballot forms distributed to each Holder of an Impaired Claim or Equity Interest that is entitled to vote to accept or reject this Plan and on which the Holder is to indicate, among other things, acceptance or rejection of this Plan.

      **1.8** *Bar Date* shall mean the date fixed by the Court for Creditors to file a Claim in the Case: November 27, 2023.

      **1.9** *Case* shall mean the Debtor's Chapter 11 case: Case No. 23-10768-smr, filed in the United States Bankruptcy Court for the Western District of Texas.

      **1.10** *Cash* shall mean, with respect to a payment, a check drawn on a bank account that has sufficient funds to pay the check when it is presented to the bank, or a wire transfer, ACH payment, or other transfer of immediately available funds.

      **1.11** *Claim* shall mean any right to payment, or right to an equitable remedy for breach of contract or performance if such breach gives rise to a right of payment, asserted against the Debtor that was in existence on or as of the Petition Date, whether or not the right to payment or right to an equitable remedy is reduced to judgment, liquidated,

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, secured, or unsecured.

**1.12** *Claimant* means the Holder of an Administrative Expense.

**1.13** *Class* shall mean the classes specified in Article II of the Plan.

**1.14** *Class C Unit(s)* shall mean those certain Equity Interests in, and issued by, the Debtor and Reorganized Debtor (pursuant to this Plan) which shall have an additional right to receive an amount equal to the cash contribution invested by the Equity Interest Holder for such Class C Unit(s) upon the occurrence of an equity financing or Liquidity Event of the Debtor.

**1.15** *Code* or *Bankruptcy Code* shall mean title 11 of the United States Code as amended from time to time.

**1.16** *Collateral* means any property or interest in property of the Debtor or the bankruptcy estate that is subject to an unavoidable Lien to secure the payment or performance of a Claim.

**1.17** *Confirmation Date* shall mean the date upon which the Confirmation Order is entered pursuant to § 1191 of the Code on the Court's docket.

**1.18** *Confirmation Order* shall mean the order entered by the Court confirming the Plan.

**1.19** *Contribution Date* shall mean 15 days after the Confirmation Date, unless extended by the Debtor in its sole discretion.

**1.20** *Court* shall mean the United States Bankruptcy Court for the Western District of Texas and any federal court with concurrent or appellate jurisdiction.

**1.21** *Creditor* shall mean any Person or entity that has a Claim against the Debtor that arose or is deemed to have arisen on or before the Petition Date, including a Claim against the Debtor's estates under § 502(f), (g) or (i) of the Code.

**1.22** *Debtor* shall mean WastePlace, LLC as a debtor-in-possession.

**1.23** *Disputed Claim* shall mean a Claim against the Debtor the allowance of which, in whole or in part, is the subject of a timely objection; provided, however, that for purposes of determining the aggregate amount of Disputed Claims against the Debtor's estate, Disputed Claims shall mean the lesser of (a) the total amount of Disputed Claims as filed with the Court or (b) the total amount of Disputed Claims as estimated by

the Court pursuant to § 502(c) of the Code; and, provided, further, that in the event the Court estimated a Disputed Claim for purposes of allowance pursuant to § 502(c), that estimation shall constitute the Allowed Claim.

**1.24** *Effective Date* shall mean the date when all the conditions set forth in Article XI of the Plan have been satisfied or waived.

**1.25** *Equity Interest* shall mean any equity interest or related proxy in the Debtor represented by duly authorized, validly issued and outstanding shares of preferred stock or common stock, stock appreciation rights, membership interests, partnership interests, or any other instrument evidencing a present ownership interest, inchoate or otherwise, in the Debtor, or right to convert into such an equity interest or acquire any equity interest of the Debtor, whether or not transferable, or an option, warrant, or right, contractual or otherwise, to acquire any such interest, which was valid, binding, and in existence as of the Confirmation Date.

**1.26** *Final Order* shall mean an order entered by the Court as to which the time to appeal or to seek review or rehearing has expired, and as to which no appeal or other proceedings for review or rehearing shall then be pending.

**1.27** *Holder* shall mean a Person who is the registered holder of a Claim or Equity Interest as of the applicable date of determination or an authorized agent of such Person.

**1.28** *Impaired* means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

**1.29** *Liquidity Event* shall mean any of the following: (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting units of the Reorganized Debtor having the right to vote for the election of members of the Reorganized Debtor's board, (ii) any reorganization, merger or consolidation of the Reorganized Debtor, other than a transaction or series of related transactions in which the holders of the voting units of the Reorganized Debtor outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale or other disposition of all or substantially all of the assets of the Reorganized Debtor. Notwithstanding the foregoing, an offering by the Reorganized Debtor of additional equity units as part of a capital raise for the bona fide

purposes of raising additional funds for operations (or to otherwise remain in compliance with a payment obligation under the Plan) shall not constitute a Liquidity Event hereunder; but any such additional cash raised shall either be (a) paid out Holders of Class 4 Claims to be compliant with the Plan, or (b) if raised for the purposes of supporting the Reorganized Debtor's commercially reasonable expenses that are necessary for the growth or viability of the company, then be included as revenue of the Reorganized Debtor as part of the calculation of Net Disposable Income in the Plan.

1.30    *Liquidity Event Distribution* shall mean the net fair market value of all cash and non-cash contributions received through a Liquidity Event less (a) any post-Effective Date ordinary course of business operating expenses and liabilities of the Reorganized Debtor (b) the reasonable and customary costs of closing such transaction(s) anticipated under a Liquidity Event, (c) any other amounts required to be paid or withheld as part of such transaction(s) anticipated under a Liquidity Event, and (d) cash payments that is due and owing to Holders of Class C Units.

1.31    *Net Disposable Income* shall have the meaning as set forth in § 1191(d)(2) of the Code.  References to Projected Net Disposable Income shall mean the projected amounts as set forth on the Debtor's Projections (i.e. a total sum of $65,949).  References to Actual Net Disposable Income shall mean the actual Net Disposable Income that is realized by the Reorganized Debtor for the Plan Period for the calendar years of 2024, 2025, and 2026.

1.32    *Person* shall mean any individual, corporation, general partnership, limited partnership, association, limited liability company, joint stock company, joint venture, estate, unincorporated organization, government, or any political subdivision thereof, governmental unit, or other entity.

1.33    *Petition Date* shall mean September 18, 2023.

1.34    *Plan* shall mean this Plan of Reorganization proposed by the Debtor and any amendments, modifications, or alterations thereto filed in accordance with the Code.

1.35    *Plan Proponent* shall mean the Debtor.

1.36    *Pre-Petition Loan Documents* shall mean the valid and enforceable promissory notes, mortgages, security agreements, guaranties, setoff, and other loan documents related thereto in effect as of the Petition Date against the Debtor, but (a) excluding the effect of any provision described in § 365(b)(2) of the Code that would act as a default before or on the Effective Date, and (b) subject to the following amendments: (i) any and all provisions in the loan documents that conflict with or are otherwise inconsistent with the Plan, orders entered by the Bankruptcy Court, and/or the Debtor's financial projections are deleted, (ii) the Debtor or Reorganized Debtor shall have the

right to prepay the outstanding amount due to a Secured Lender at any time without payment of a prepayment penalty and without the Secured Lender's ability to exercise any option to control, purchase, or buyout, (iii) all net worth, debt service coverage, debt service reserve, insolvency, capital requirements and other financial performance requirements, covenants and/or ratios are deemed deleted, (iv) a Secured Creditor's determination that there has been a material adverse effect or change in collectability of the loan, or that it deems itself insecure shall not constitute a loan default and any such provision or similar subjective provision is deleted, (v) any pre-petition defaults under the Pre-Petition Loan Documents shall be deemed waived by the Secured Creditor, (vi) prohibitions on secondary liens and indebtedness securing purchases made in the ordinary course of business are deleted, (vii) the Debtor shall have the right to contest and/or remove mechanic's and similar liens, and (viii) any applicable minimum occupancy, revenue, net income, or similar requirements and their related covenants are deleted.

1.37    *Projections* shall mean the Debtor's cash flow projections attached as **Addendum 2** to this Plan, with such cash flow projections having been prepared internally by the Debtor with input from its professionals and determined through a review of (a) historical revenues and expenses of the Debtor, (b) the Debtor's current operations, (c) anticipated events that the Debtor believes will impact the ability to operate positively and negatively, and (d) the obligations that will be owed pursuant to the Debtor's Plan.

1.38    *Pro-Rata* or *Pro-Rata Basis* shall mean, with respect to any Holder of an Allowed Claim, an amount calculated by and reduced to the proportion that the amount of the Claim bears to the aggregate amount of all Claims in the same Class or pool.

1.39    *Reorganized Debtor* shall mean the Debtor after the Confirmation Date and after the Effective Date.

1.40    *Sub V Trustee* shall mean Michael G. Colvard, solely in his capacity as a the Court-appointed trustee under 11 U.S.C. § 1183.

1.41    *Reorganization Fund* shall mean (a) the sum of cash contributions received by the Debtor on or before the Contribution Date from Holders of Equity Holders *less* (b) an amount of Cash sufficient to satisfy all Allowed Administrative Expenses and (c) a working capital holdback of $50,000 to be held by the Reorganized Debtor to fund operations pursuant to the Projections.

1.42    *Right Offering* shall have the meaning as set forth in Section 4.5(a).

1.43    *RMS* shall mean RMS LMB WP Holdings, LLC, which shall have an Allowed Class 4 Unsecured Claim in the amount of $1,142,306.40

**1.44**    *Texas Comptroller* shall mean the Texas Comptroller of Public Accounts.

**1.45**    *Voting Deadline* shall mean the date set by the Court for interested parties to submit a Ballot.

**1.46**    *WHA* shall mean William Henry Agency, LLC.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS

**2.1**    **Class 1** shall consist of the Allowed Secured Claim of WHA.
**2.2**    **Class 2** shall consist of the Texas Comptroller's Allowed Secured Claim.
**2.3**    **Class 3** shall consist of Allowed Priority Claims.
**2.4**    **Class 4** shall consist of Allowed Unsecured Claims.
**2.5**    **Class 5** shall consist of all Allowed Equity Interests.

## ARTICLE III
## TREATMENT OF UNCLASSIFIED PRIORITY CLAIMS
## AND ADMINISTRATIVE EXPENSES

**3.1**    *Administrative Expenses.* Administrative Expenses that have not already been paid during the Case shall be paid (i) in full on the Effective Date of the Plan upon a Final Order of allowance by the Court, or (ii) upon such other terms as may be agreed to in writing by such Claimant and the Debtor. An Administrative Expense that arose after the Petition Date in the ordinary course of business of the Debtor shall be paid by the Debtor in the ordinary course of business pursuant to the usual and customary terms of the Claimant or as otherwise authorized by the Court. An Administrative Expense that arises after the Confirmation Date shall be paid by the Reorganized Debtor in the ordinary course of business.

## ARTICLE IV
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

The Classes of Claims shall be treated as follows:

**4.1**    *Class 1: Allowed Claim of WHA*. The Allowed Claim of WHA arising from its convertible promissory note with the Debtor shall be allowed in the amount of its filed Proof of Claim, as may be amended.  WHA's Claim is impaired under the Plan. On the Confirmation Date, WHA shall be deemed to elect treatment under option (c) set forth below:

**(a)** *Participation in the Rights Offering.* WHA may participate in the Rights Offering. Should WHA elect to do so, for every dollar that WHA contributes as part of the Rights Offering, one dollar of WHA's Allowed Claim shall be deemed to be secured under § 506(a) of the Code. To the extent WHA's Claim is treated as an Allowed Secured Claim, the Debtor shall repay the balance of such Claim pursuant to WHA's Pre-Petition Loan Documents (except with a Maturity Date of 5 years from the Effective Date) and WHA shall retain its security interests in the Debtor consistent thereto.

**(b)** *Opt-out of the Rights Offering.* Should WHA elect not to participate in the Rights Offering (or in any amount less than its Class 1 Claim), then WHA's Allowed Claim shall be a secured claim under § 506(a) of the Code only to the extent so ordered by the Bankruptcy Court. Any such amount of WHA's Allowed Claim that is secured shall be repaid by the Reorganized Debtor pursuant to WHA's Pre-Petition Loan Documents (except with a Maturity Date of 5 years from the Effective Date) and WHA shall retain its security interests in the Debtor consistent thereto. The balance of WHA's Allowed Claim that is not treated as secured pursuant to Section 4.1(a) or 4.1(b), shall be treated as a Class 4 Unsecured Claim unless WHA elects to convert such balance pursuant to Section 4.1(c).

**(c)** *Conversion of the Note.* WHA may, in whole or in part, choose to convert its Allowed Claim to Class C Units, pursuant to the terms and provisions of an Agreed Conversion (as defined within WHA's Prepetition Loan Documents). To the extent WHA elects to convert its Class 1 Claim under this Section 4.1(c), the amount of such Claim so converted shall be deemed to be satisfied against the Debtor in exchange for the corresponding Class C Units received in the Agreed Conversion, and any corresponding lien of WHA shall be deemed fully satisfied and released. The Debtor shall engage in and help facilitate reasonable efforts to cause no less than $50,000 of WHA's Class C Units to be purchased through a private transaction by other Equity Interest Holders within 6 months after the Effective Date. Additionally, to secure partial payment towards such Class C Unit purchase, counsel for the Debtor, Michael Best & Friedrich LLP, shall reserve in trust from its Allowed Administrative Expenses (as may later be approved by the Court) the total sum of $25,000, which shall be remitted in whole or in part to WHA in partial satisfaction of the Class C Unit purchase in the event and to the extent that the full amount is not purchased by other Equity Interest Holders.

### 4.2 *Class 2: Allowed Secured Claim of the Texas Comptroller.*

**(a)** The Texas Comptroller of Public Accounts filed Claim No. 8 in the Case in the claimed amount of $126,239.18. To the extent the Texas Comptroller's Claim is Allowed and not satisfied from a distribution from the Reorganization Fund, the Debtor shall pay the balance of such Allowed Claim as follows: Beginning on the first day of the first month following the Effective Date, and continuing monthly thereafter, the Debtor shall make payments against the Class 2 Claim with interest at the applicable

prime rate plus 1%, amortized over 5 years. In the event of a default in the payments proposed to Class 2, then the Texas Comptroller may seek collection of the balance of any unpaid amounts against the Debtor, using any means available under state or federal law.

**(b)** Notwithstanding anything else to the contrary in the Plan or the Confirmation Order, the Texas Comptroller reserves the following rights: (a) any statutory or common law setoff rights in accordance with 11 U.S.C. § 553; (b) any rights to pursue any non-debtor third parties for tax debts or claims; (c) the payment of interest on the Texas Comptroller's allowed administrative expense tax claims, if any; (d) to the extent that interest is payable with respect to any allowed administrative expense, priority, or secured tax claim of the Texas Comptroller, payment of the statutory rate of interest pursuant to Texas Tax Code § 111.060; and (e) the Texas Comptroller is not required to file a motion or application for payment of administrative expense claims pursuant to 11 U.S.C. § 503(b)(1)(D).

**(c)** Should the Reorganized Debtor fail to make any payments to the Texas Comptroller as required in this Plan (or fail to timely pay post-petition and/or post-confirmation taxes while the Reorganized Debtor is still paying any pre-petition debt), the Texas Comptroller shall provide written notice of such default to the Debtor and the Debtor's attorney advising of that default and providing the Reorganized Debtor with a period of fifteen (15) days to cure the default. In the event the default is not cured within 15 days, the Texas Comptroller may, without further order of this Court or notice to the Debtor, pursue all rights and remedies available under applicable Texas law to collect the full amount of all taxes, penalties, and interest owed. The Debtor and/or Reorganized Debtor can receive up to three (3) notices of default, however, the fourth default cannot be cured unless the outstanding balance then due is paid in full.

**4.3** *Class 3: Allowed Priority Claims.* The Allowed Priority Claim of the Texas Comptroller on account of any franchise taxes (and related fees, costs, and penalties) has been satisfied by the Debtor during the Case. The Allowed Priority Claim of Adam Greenspan arising from certain Pre-petition wages shall be Allowed in the total amount of $1,250. Class 3 Claims are unimpaired and to the extent not already satisfied, will be paid in full on the Effective Date.

**4.4** *Class 4: Allowed Unsecured Claims.* Allowed Unsecured Claims in Class 4 are impaired. Each Claim in Class 4 shall receive payments equal to the following:

**(a)** A Pro Rata share of the Reorganization Fund, to be distributed by the Plan Proponent on the Effective Date;

**(b)** Should a Liquidity Event occur within 3 years of the Confirmation Date, Holders of an Allowed Unsecured Claim in Class 4 shall receive a Pro Rata Share

of the Liquidity Event Distribution (if any), until the unpaid balance of such Allowed Unsecured Claim is paid in full, with no interest. Payment of the Liquidity Event Distribution shall be subject to and subordinate to any distribution that would be afforded to Holders of Class C Units;

   **(c)**  Pro Rata distributions equal to the *greater* of the annualized amount of (i) the Debtor's Projected Net Disposable Income or (ii) 75% of the Debtor's Actual Net Disposable Income per calendar year. Such distributions, whether under sub. (i) or (ii), shall be distributed no later than 60 days after closing the books on December 31st each year for the calendar years 2024 through 2026 (the "Plan Period").

     (i)  In the event the Debtor reports Actual Net Disposable Income for the first six-month period of any calendar year during the Plan Period, the Debtor will make an interim payment (an "Interim Payment") to Class 4 Creditors (of 75% of such Actual Net Disposable Income during such six-month period), provided that making the Interim Payment does not cause the Debtor's working capital reserves to drop below $50,000. Any Interim Payment made shall be credited against the annualized payment that may be due under 4.4(c)(i) or (ii).

     (ii)  The Reorganized Debtor shall make available upon request to a Holder of a Class 4 Claim, verified quarterly financial statements that are kept in the Reorganized Debtor's ordinary course of business (within a reasonable period of time after the close of any calendar quarter) and year-end financial statements and/or tax returns (within 60 days after closing the books for each calendar year).

     (iii)  The Reorganized Debtor shall use commercially reasonable efforts to abide by the anticipated expenses set forth in the Projections in a manner consistent with the Plan and with the goal of increasing the Reorganized Debtor's long-term growth and profits for the benefit of all stakeholders.

  The treatment afforded to Class 4 Claims pursuant to this section shall fully discharge all Class 4 Claims as of the Effective Date of the Plan, provided that the Plan is confirmed under 11 U.S.C. § 1191(a).

  **4.5** *Class 5: Holders of Allowed Equity Interests*. Members in Class 5 that hold Allowed Equity Interests in the Debtor are unimpaired by the Plan. Holders of Allowed Equity Interests shall retain their interests as provided for by, and subject to further dilution as allowed by the Plan and the Debtor's organizational documents.

   **(a)** *Rights Offering*. Through the Plan, Holders of Allowed Equity Interests are requested and authorized to pay into the Reorganized Debtor additional investments in exchange for Class C Units in the Reorganized Debtor. The Plan Proponent suggests that a minimum contribution should be no less than 10% of such

Equity Interest Holder's original capital contribution. In exchange for such investment, Holders that participate will receive approximately 17.32 Class C Units in the Reorganized Debtor for every $1.00 invested.

This Rights Offering shall remain open through the Contribution Date at which time, such fundraising round shall close. Holders of Equity Interests that wish to participate in the Rights Offering shall (1) notify the Debtor in writing (in a form substantially similar to **Addendum 3**) as soon as reasonably practicable in light of the Voting Deadline but in no event after the Contribution Date, and (2) shall transmit Cash to the Debtor on or before the Contribution Date in exchange for the corresponding amount of Class C Units as set forth herein.

## ARTICLE V
## TREATMENT OF DISPUTED CLAIMS

**5.1** *Objection to Claims; Prosecution of Disputed Claims*. The Debtor, the Reorganized Debtor and any other party in interest, shall object to the allowance of any Claims filed with the Court with respect to which any party in interest disputes liability in whole or in part. The Debtor or any interested party must object to Claims on or before 60 days after the Effective Date of the Plan, or as otherwise ordered by the Court. All objections shall be litigated to a Final Order; provided, however, that any interested party may compromise and settle any objection without notice or approval of the Court.

**5.2** *Payments and Distributions on Disputed Claims*. From and after the Effective Date, and except as otherwise provided in the Plan, the Plan Proponent shall hold and reserve in a segregated account, for the benefit of each holder of a Disputed Claim, Cash in an amount equal to the distribution that would have been made to the holder of any Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the amount of the Disputed Claim or (ii) the amount in which the Disputed Claim shall be estimated by the Court pursuant to § 502 of the Code for purposes of allowance. Any Cash reserved and held for the benefit of a holder of a Disputed Claim shall be treated as a payment and reduction on account of such Disputed Claim for purposes of computing (a) any additional amounts to be paid in Cash in the event the Disputed Claim ultimately becomes an Allowed Claim or (b) any interest payable in accordance with the Plan by the Debtor with respect to such Disputed Claim at the time or times such cash is reserved. No payment or distribution shall be made with respect to all or any portion of any Disputed Claim until resolution of the Disputed Claim.

At the time a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder of the Allowed Claim shall receive the payment(s) and distribution(s) to which it is then entitled under the Plan, together with any interest that has accrued on the amount of cash so reserved, but only to the extent that actual interest has been earned after the deposit of such amount. Such payment(s) shall be made as soon as practicable after the

date the order allowing the Claim becomes a Final Order but in no event later than 30 days after the date of the Final Order. Any cash reserved for but not necessary to pay a Disputed Unsecured Claim shall be distributed to the holders of other Allowed Unsecured Claims on a Pro-Rata Basis. Disputed Claims which are disallowed shall receive nothing to the extent they are disallowed.

**ARTICLE VI**
**MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN**

**6.1** *Cash for Payments Under the Plan.* Cash necessary to fund payments shall be from the Reorganization Fund and the Debtor's normal business operations and cash on hand as of the Effective Date.

**6.2** *Management of the Reorganized Debtor's Affairs.* The Debtor shall manage its financial and business affairs as a Reorganized Debtor after the Effective Date. Except as altered by this Plan, the existing shareholders of the Debtor shall continue to be the shareholders of the Reorganized Debtor, in such level and amount as consistent with the terms and provisions of the Debtor's articles, bylaws, and other corporate documents. The Debtor's existing Managers shall continue to hold their same positions with regards to the Reorganized Debtor.

**6.3** *Distributions Due on and after the Effective Date.* The Debtor shall pay all distributions under the Plan for Allowed Claims and Administrative Expenses as set forth in the Plan, or as may otherwise be acceptable by such Claimant. **Due to confirmation under § 1191(a), the Reorganized Debtor shall be responsible for all payments due to Creditors under the Plan.**

**6.4** *Professional Fees and Expenses.* Each person retained or requesting compensation in this case pursuant to §§ 327, 328, 330, 503(b), or 1103 of the Code shall be entitled to file an application for allowance of final compensation and reimbursement of expenses in the case. Such amounts, if allowed, shall be paid as an Administrative Expense pursuant to Section 3.1 of the Plan. All final applications for allowance and payment of professional fees and expenses shall be filed with the Bankruptcy Court no later than 60 days after the Confirmation Date, unless otherwise ordered by the Bankruptcy Court.

**6.5** *Mailing and Unclaimed Distributions.* All distributions made by mail will be made to (a) the latest mailing address filed of record with the Court for the party entitled to it, (b) if no such mailing address has so been filed, the mailing address reflected in the schedule of assets and liabilities filed by the Debtor or (c) any other address known to Debtor or the Reorganized Debtor. Any unclaimed distributions after six months from the distribution which would otherwise have been disbursed to a Creditor with respect to an Allowed Claim shall be distributed to other Allowed Claims pursuant to their

priority under the Plan if such Creditor cannot be located or retained by the Reorganized Debtor if all such Allowed Claims have been paid in full.

**6.6     *Responsible Person***. Except as otherwise may be provided in the Plan, the Reorganized Debtor shall be responsible for the execution and implementation of the Plan.

**6.7     *Debtor's Property After Confirmation***. Except as provided in the Plan, the Reorganized Debtor shall retain possession all of property, free and clear of all liens and encumbrances, except encumbrances of governmental authorities and utilities for easements and services.  The Reorganized Debtor may use, acquire, dispose of, settle, liquidate, or otherwise sell any of its property without further Court approval.

**6.8     *Settlement of Actions or Objections***. The Plan Proponent may settle or compromise any action or objection without notice or Court approval.

**6.9     *Preference, Fraudulent Conveyances, Other Avoidance Actions and Other Causes of Action***.  Except as otherwise provided in the Plan, all Claims of the Debtor against any Person, and all rights to recover preferences, fraudulent transfers or other actions that arose after the Petition Date under the Code or otherwise shall vest in the Reorganized Debtor on the Effective Date.

**6.10    *Confirmation Without Approval of Classes***. If any Class is entitled to vote and votes to reject the Plan, the Debtor shall request that the Bankruptcy Court approve the Plan pursuant to § 1191(b) of the Code.

**ARTICLE VII**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**7.1     *Treatment of Unexpired Leases and Executory Contracts***.

**(a)     *Assumption & Rejection of Unexpired Leases and Executory Contracts***. The Debtor assumes or rejects the unexpired leases and executory contracts as indicated on **Addendum 4** as of the Effective Date. The Debtor reserves the right to modify its decision to assume or reject any executory contract listed on Addendum 4 (or to add additional executory contracts not otherwise listed on Addendum 4) at any time prior to the final hearing on confirmation of the Plan.

**(b)     *Cure Amount***. Any assumed unexpired leases and executory contracts shall vest in the Reorganized Debtor as of the Effective Date.  The amount to cure any default in an assumed unexpired lease or executory contract is presumed to be the amount stated on Addendum 4 as the "Cure Amount" unless a party-in-interest objects by the Voting Deadline. If an objection is filed, the Court shall determine the

17

amount necessary to cure any default of the Debtor necessary to assume the unexpired lease or executory contract. The Debtor shall have 15 days after a Final Order to change its decision to assume the unexpired lease or executory contract and instead reject it. The amount necessary to cure any default in an unexpired lease or executory contract shall be paid by the Reorganized Debtor within 30 days after the order determining the amount becomes a Final Order, or within 180 days after the Effective Date if no objection is filed.

(c) *Rejection Damages*. The amount of the Allowed Claim from the rejection of an unexpired lease or executory contract is presumed to be the amount indicated on Addendum 4 as the "Claim Amount" unless a party-in-interest files a proof of Claim as provided in this Article. The Debtor or Reorganized Debtor shall have 15 days after the Claim becomes an Allowed Claim to change its decision to reject the unexpired lease or executory contract and instead assume it. In such case, the Debtor or Reorganized Debtor shall file an amended Addendum 4 incorporating such Allowed Claim as the new "Cure Amount".

7.2 *Bar Date for Claims Relating to Rejected Leases or Executory Contracts*. Unless otherwise ordered by the Court, the deadline to file proofs of Claim(s) for damages arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan shall be the later of (i) the General Bar Date, or (ii) 30 days after the mailing to such Claimant of notice of the entry of the Confirmation Order (or other applicable Order approving the rejection of such executory contract or unexpired lease). All such Claim(s) not filed within the time set forth in this section shall be forever barred and extinguished against the Debtor, its Estate, and the Reorganized Debtor. If no proof of Claim is timely filed, the Creditor's Claim shall be an Allowed Unsecured Claim in the amount stated as the "Claim Amount," if any.

7.3 *Default Provision for Unexpired Leases and Executory Contracts Not Specifically Listed*. Any executory contracts or unexpired leases not specifically identified herein, including all of the Debtor's executory contracts with its customers are assumed.

### ARTICLE VIII
### AMENDMENTS AND WAIVER

Except as otherwise provided in the Plan and § 1193 of the Code, any non-material term of the Plan may be amended or modified at any time, and the enforcement and observance of any term of the Plan may be waived at any time provided that all Creditors affected by the amendment or waiver have received notice of the proposed non-material amendment or waiver and have not objected in writing within a reasonable period of time and, in any event, any period of time which may be set by the Court. The Debtor reserves the right to revoke, amend, modify, or withdraw the Plan, and any Addendum, at any time prior to the Effective Date.

## ARTICLE IX
## EFFECT OF CONFIRMATION

**9.1** *Discharge of Debtor.* Except as otherwise provided in the Plan or in the Confirmation Order, the Debtor will obtain a discharge as provided in § 1192 of the Code on the Effective Date provided that the Plan is confirmed pursuant to § 1191(a). If the Plan is confirmed pursuant to § 1191(b), the Debtor will obtain a discharge upon completion of all payments required under the Plan. The discharge of the Debtor and Reorganized Debtor shall be effective as to each Claim upon receipt of such distribution afforded to each Claim under the Plan, regardless of whether a proof of Claim was filed for such Claim, whether the Claim is an Allowed Claim, or whether the holder of the Claim, debt or liability has accepted the Plan. Such discharge shall not affect any liability of any non-Debtor with respect to any Claim.

**9.2** *Exculpation.* **The employees, advisors, attorneys, professionals, or agents of the Debtor do not have and will not incur any liability to any Creditor, Claimant or the Debtor for any act or omission in connection with, related to, or arising out of, the Case, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan, or the property to be distributed under the Plan, except for willful misconduct, and in all respects the employees, advisors, professionals, and agents are entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan,** *provided however,* **the foregoing will not apply to any acts or omissions determined by final order to constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct.**

**9.3** *Injunction.* **Except as otherwise provided for in the Plan and except for any actions to enforce the terms of the Plan, all Persons who have held, hold, or may hold Claims as of the Effective Date are permanently enjoined after the Effective Date from:**

**(a)  commencing and continuing in any manner any action or other proceeding of any kind with respect to any Claim against the Reorganized Debtor;**

**(b)  enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree, or order against the Reorganized Debtor with respect to such Claim;**

**(c)  creating, perfecting, or enforcing any encumbrance of any kind against the Reorganized Debtor with respect to such Claim; and**

**(d)  asserting any right of set-off, subrogation, or recoupment of any kind against any obligation due to the Reorganized Debtor with respect to such Claim.**

**9.4**     ***Consummation***.  Upon substantial consummation of the Plan, the Debtor or Reorganized Debtor may move for a final decree closing the Case and requesting such additional orders as may be just and equitable. Any post-confirmation reports required to be filed shall be the obligation of the Reorganized Debtor.

**9.5**     ***Duties & Discharge of Sub V Trustee.***  Because the Plan is confirmed pursuant to § 1191(a), the Sub V Trustee shall be discharged upon substantial consummation of the Plan.

**9.6**     ***Post-Confirmation Default.***  Except for the rights of WHA and the Texas Comptroller who shall be afforded the protections set forth in Sections 4.1 and 4.2 of the Plan, the provisions set forth in § 1191(c)(3)(B)(ii) are inapplicable to this Plan due to the fact that confirmation will be consensual under § 1191(a); accordingly, such default provisions are unnecessary under the circumstances. In the event that the Effective Date fails to occur, any interested party may file a motion with the Bankruptcy Court seeking (a) enforcement of the Plan, (b) relief from the automatic stay, (c) dismissal or conversion of the Case, or (d) any other appropriate relief that my be warranted under the circumstances.  Upon the occurrence of the Effective Date the automatic stay shall terminate with respect to any obligations under this Plan.

### ARTICLE X
### RETENTION OF JURISDICTION

The Court retains jurisdiction over this Case, until the Plan has been fully consummated, for all appropriate purposes including, but not limited to, the following:

**10.1**     To hear all applications for compensation of professionals under § 330 of the Code.

**10.2**     To classify or reclassify a Claim of any Creditor, and to resolve any and all objections filed against any Claim. Any failure of the Debtor to object to or examine any Claim for purposes of voting shall not be deemed a waiver of the Debtor's or Reorganized Debtor's right to object to or re-examine any Claim in whole or in part.

**10.3**     To determine all questions and disputes arising under the Plan including those regarding title to or interests in the Reorganized Debtor's assets as well as the resolution of all Claims, causes of action, controversies, disputes, or conflicts, including any preference, fraudulent conveyance or avoidance action pending as of the Confirmation Date, and for which jurisdiction is specifically retained in the Plan.

**10.4**     To correct any defect, cure any omission, or fix any inconsistency in the Plan or the Confirmation Order necessary to carry out the purposes and intent of the Plan.

**10.5** To modify the Plan after confirmation.

**10.6** To enforce and interpret the terms and conditions of the Plan, and to enforce any or all of the orders entered by the Court.

**10.7** To enter any order, including orders for injunctive relief, necessary to enforce the title, rights, and powers of the Debtor, or Reorganized Debtor, as well as to impose such restrictions, limitations, terms and conditions as the Court may deem necessary.

**10.8** To supervise or approve any aspect of any Claim that might be pursued on behalf of the Debtor, Reorganized Debtor or any Creditor.

**10.9** To resolve all adversary actions and proceedings brought in the Case.

**10.10** To enter any order concluding and terminating the Case.

## ARTICLE XI
## CONDITIONS PRECEDENT TO EFFECTIVENESS

The Effective Date of the Plan shall occur when each of the following conditions has been met or waived in writing by the Plan Proponent, with such waiver filed with the Court:

**11.1** The Confirmation Order shall have been entered by the Court.

**11.2** No stay of the Confirmation Order shall be in place.

**11.3** There has not been a timely appeal of the Confirmation Order.

**11.4** Fourteen days have passed since the last date for a timely appeal of the Confirmation Order.

**11.5** Ten business days have lapsed after the Contribution Date.

## ARTICLE XII
## MISCELLANEOUS

**12.1** The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the text of the Plan.

**12.2** Any Claim that is not an Allowed Claim, or any portion of any Claim that is not allowed, shall receive no distribution and shall not be paid under the Plan.

**12.3**    At any time, the Reorganized Debtor may prepay, without penalty, and without the need to pay any unearned interest, any of its obligations under the Plan to any or all Creditors if the Reorganized Debtor has the ability to do so and otherwise complies with the remaining obligations under the Plan.

**12.4**    Unless otherwise provided for in the Plan, no holder of an Allowed Claim shall be entitled to the accrual of post-petition interest on account of such Claim.

**12.5**    The rules of construction set forth in § 102 of Code shall apply to the Plan.

**12.6**    The Liens of all Creditors that have been discharged or avoided shall be released of record contemporaneously with final cash distributions or the surrender of property secured by the Liens under the Plan.

**12.7**    The liens of every Creditor with a Claim that is disallowed or whose lien is avoided shall be void and shall be rendered void by the recording in the appropriate place of record of a certified copy of any order (including the Confirmation Order, if applicable) disallowing the Claim or avoiding the lien.

**12.8**    Any orders entered or agreements approved by the Court for the use of cash collateral, for adequate protection, or for payments in lieu of the lifting of the automatic stay shall be terminated upon entry of the Confirmation Order.  At that time, the relationship between the respective parties shall be governed by the Plan, regardless of any recurring obligations under such prior orders.

**12.9**    Unless otherwise provided for in the Plan, no holder of an Allowed Unsecured Claim shall be entitled to the accrual of post-petition interest on account of such Claim.

**12.10**   Any documents necessary to effectuate the provisions of the Plan shall be filed with the Court before the hearing on confirmation of the Plan unless otherwise ordered by the Court.

**12.11**   The attorneys' fees and costs to administer the Plan shall be reasonable.

## **CONCLUSION**

The Plan reflects the Debtor's efforts to restructure its affairs in a manner that advances the interests of the Estate and complies in all aspects with the requirements of the Code. The Debtor respectfully submits and requests that the Plan be approved and confirmed.

Dated: January 25, 2024.

**MICHAEL BEST & FRIEDRICH LLP**

*/s/ Justin M. Mertz*

Justin M. Mertz, Esq.
790 N. Water St., Ste. 2500
Milwaukee, WI 53202
Phone: 414.271.656
Fax: 414.277.0656
Email: jmmertz@michaelbest.com

## ADDENDUM 1
## LIQUIDATION ANALYSIS

**Liquidation Analysis**

| Description | Scheduled Value | FMV (Est.) | Liquidation Cost | Net Estate Value | Cum.Total |
|---|---|---|---|---|---|
| *Office furniture, fixtures, and equipment* | $ 5,000 | $ 5,000 | $ 1,000 | $ 4,000 | |
| *Other Intangibles and IP* | $ 15,000 | $ 15,000 | $ 3,000 | $ 12,000 | |
| *Inventory* | $ - | $ - | $ - | $ - | |
| *Cash* | $ 44,136 | $ 10,000 | $ - | $ 10,000 | |
| *Accounts Receivable* | $ 35,884 | $ - | $ - | $ - | |
| *Avoidance Actions & Other Claims* | $ - | $ - | $ - | $ - | |
| **Totals** | $ 100,020 | | | $ 26,000 | $ 26,000 |
| *Ch. 7 Trustee Fees* | | | | | |
| *25% (first $5,000)* | | | | $ (1,250) | $ 24,750 |
| *10% (next $45,000)* | | | | $ (2,100) | $ 22,650 |
| *5% (next 950,000)* | | | | $ - | |
| *Secured Claim of Texas Comptroller* | | | | $ (126,447) | $ - |
| *Debtor's Counsel Fees* | | | | $ (75,000) | |
| *Priority Claims* | | | | $ (1,750) | |
| Net Proceeds available to General Creditors | | | | $ - | 0% |

## ADDENDUM 2
## PROJECTIONS

| 2024 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | |
| Dumpster Rental | $ 5,000 | $ 6,000 | $ 7,000 | $ 8,000 | $ 9,000 | $ 10,000 | $ 11,000 | $ 12,000 | $ 13,000 | $ 14,000 | $ 15,000 | $ 16,000 | $ 126,000 |
| Junk | $ 5,000 | $ 7,000 | $ 9,000 | $ 11,000 | $ 13,000 | $ 15,000 | $ 17,000 | $ 19,000 | $ 21,000 | $ 23,000 | $ 25,000 | $ 27,000 | $ 192,000 |
| Portable Toilets & Hand Washing Stations | $ 500 | $ 1,000 | $ 4,000 | $ 4,500 | $ 5,000 | $ 5,500 | $ 6,000 | $ 6,500 | $ 7,000 | $ 7,500 | $ 8,000 | $ 8,500 | $ 64,000 |
| Recurring Residential + Business Service | $ 70,000 | $ 80,000 | $ 90,000 | $ 100,000 | $ 110,000 | $ 120,000 | $ 130,000 | $ 140,000 | $ 150,000 | $ 160,000 | $ 170,000 | $ 180,000 | $ 1,500,000 |
| **Total Sales** | **$ 80,500** | **$ 94,000** | **$ 110,000** | **$ 123,500** | **$ 137,000** | **$ 150,500** | **$ 164,000** | **$ 177,500** | **$ 191,000** | **$ 204,500** | **$ 218,000** | **$ 231,500** | **$ 1,882,000** |
| | **$ 80,500** | **$ 94,000** | **$ 110,000** | **$ 123,500** | **$ 137,000** | **$ 150,500** | **$ 164,000** | **$ 177,500** | **$ 191,000** | **$ 204,500** | **$ 218,000** | **$ 231,500** | **$ 1,882,000** |
| | | | | | | | | | | | | | |
| **Platform Service Fee** | $ 4,025 | $ 4,700 | $ 5,500 | $ 6,175 | $ 6,850 | $ 7,525 | $ 8,200 | $ 8,875 | $ 9,550 | $ 10,225 | $ 10,900 | $ 11,575 | $ 94,100 |
| **Total Sales + Platform Fee** | **$ 84,525** | **$ 98,700** | **$ 115,500** | **$ 129,675** | **$ 143,850** | **$ 158,025** | **$ 172,200** | **$ 186,375** | **$ 200,550** | **$ 214,725** | **$ 228,900** | **$ 243,075** | **$ 1,976,100** |
| **Cost of Goods Sold** | | | | | | | | | | | | | |
| **Purchases - COS** | | | | | | | | | | | | | |
| Dumpster Rental | $ 4,350 | $ 5,220 | $ 6,090 | $ 6,960 | $ 7,830 | $ 8,700 | $ 9,570 | $ 10,440 | $ 11,310 | $ 12,180 | $ 13,050 | $ 13,920 | $ 109,620 |
| Junk | $ 4,000 | $ 5,600 | $ 7,200 | $ 8,800 | $ 10,400 | $ 12,000 | $ 13,600 | $ 15,200 | $ 16,800 | $ 18,400 | $ 20,000 | $ 21,600 | $ 153,600 |
| Portable Toilets & Hand Washing Stations | $ 400 | $ 800 | $ 3,200 | $ 3,600 | $ 4,000 | $ 4,400 | $ 4,800 | $ 5,200 | $ 5,600 | $ 6,000 | $ 6,400 | $ 6,800 | $ 51,200 |
| Recurring Business Service | $ 59,500 | $ 68,000 | $ 76,500 | $ 85,000 | $ 93,500 | $ 102,000 | $ 110,500 | $ 119,000 | $ 127,500 | $ 136,000 | $ 144,500 | $ 153,000 | $ 1,275,000 |
| Cost of Goods Sold | $ 68,250 | $ 79,620 | $ 92,990 | $ 104,360 | $ 115,730 | $ 127,100 | $ 138,470 | $ 149,840 | $ 161,210 | $ 172,580 | $ 183,950 | $ 195,320 | **$ 1,589,420** |
| **Total Cost of Goods Sold** | **$ 68,250** | **$ 79,620** | **$ 92,990** | **$ 104,360** | **$ 115,730** | **$ 127,100** | **$ 138,470** | **$ 149,840** | **$ 161,210** | **$ 172,580** | **$ 183,950** | **$ 195,320** | **$ 1,589,420** |
| **Gross Profit** | **$ 16,275** | **$ 19,080** | **$ 22,510** | **$ 25,315** | **$ 28,120** | **$ 30,925** | **$ 33,730** | **$ 36,535** | **$ 39,340** | **$ 42,145** | **$ 44,950** | **$ 47,755** | **$ 386,680** |

| Expenses | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Administration** | | | | | | | | | | | | | |
| Supplies | $ - | $ - | $ 50 | $ - | $ - | $ 50 | $ - | $ - | $ 50 | $ - | $ - | $ 50 | $ 200 |
| Cell Phones & Internet (4 heads) | $ 60 | $ 60 | $ 60 | $ 60 | $ 60 | $ 60 | $ 60 | $ 60 | $ 60 | $ 60 | $ 60 | $ 60 | $ 720 |
| Financial Software | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 3,262 |
| Health Insurance (4 heads) | $ 2,169 | $ 2,169 | $ 2,169 | $ 2,169 | $ 2,169 | $ 2,169 | $ 2,169 | $ 2,169 | $ 2,169 | $ 2,169 | $ 2,169 | $ 2,169 | $ 26,033 |
| Business Insurance | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 892 |
| **Professional Fees** | | | | | | | | | | | | | |
| 1099 Contractors | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 12,000 |
| Accounting/CPA | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 400 | $ 4,800 |
| Legal | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 1,200 |
| **Total Professional Fees** | **$ 1,500** | **$ 1,500** | **$ 1,500** | **$ 1,500** | **$ 1,500** | **$ 1,500** | **$ 1,500** | **$ 1,500** | **$ 1,500** | **$ 1,500** | **$ 1,500** | **$ 1,500** | **18,000** |
| **Total Professional + Admin.** | **$ 4,076** | **$ 4,076** | **$ 4,126** | **$ 4,076** | **$ 4,076** | **$ 4,126** | **$ 4,076** | **$ 4,076** | **$ 4,126** | **$ 4,076** | **$ 4,076** | **$ 4,126** | **49,108** |
| **Bank & Finance Charges** | | | | | | | | | | | | | $ - |
| Bank Service Charges | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 600 |
| Finance Charges | | | | | | | | | | | | | $ - |
| **Total Interest Expense** | **$ 50** | **$ 50** | **$ 50** | **$ 50** | **$ 50** | **$ 50** | **$ 50** | **$ 50** | **$ 50** | **$ 50** | **$ 50** | **$ 50** | **600** |
| QuickBooks Payments Fees | | | | | | | | | | | | | |
| Stripe Fees | $ 1,893 | $ 2,211 | $ 2,587 | $ 2,905 | $ 3,222 | $ 3,540 | $ 3,857 | $ 4,175 | $ 4,492 | $ 4,810 | $ 5,127 | $ 5,445 | $ 44,265 |
| Stripe Fees Passed to Customer | $ (1,893) | $ (2,211) | $ (2,587) | $ (2,905) | $ (3,222) | $ (3,540) | $ (3,857) | $ (4,175) | $ (4,492) | $ (4,810) | $ (5,127) | $ (5,445) | $ (44,265) |
| **Total Bank & Finance Charges** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **-** |
| General Expenses | | | | | | | | | | | | | $ - |
| Software Rental | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 24,000 |
| **Total General Expenses** | **$ 2,000** | **$ 2,000** | **$ 2,000** | **$ 2,000** | **$ 2,000** | **$ 2,000** | **$ 2,000** | **$ 2,000** | **$ 2,000** | **$ 2,000** | **$ 2,000** | **$ 2,000** | **24,000** |
| Miscellaneous Expense | | | | | | | | | | | | | $ - |
| Payroll Expenses | | | | | | | | | | | | | $ - |
| **Sales Tax Plan Repayment** | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | **28,775** |
| Employee Wages W2 | $ 7,500 | $ 7,500 | $ 8,500 | $ 8,500 | $ 9,500 | $ 9,500 | $ 10,500 | $ 10,500 | $ 10,500 | $ 10,500 | $ 10,500 | $ 10,500 | $ 114,000 |
| **Total Payroll Expenses** | **$ 9,898** | **$ 9,898** | **$ 10,898** | **$ 10,898** | **$ 11,898** | **$ 11,898** | **$ 12,898** | **$ 12,898** | **$ 12,898** | **$ 12,898** | **$ 12,898** | **$ 12,898** | **142,775** |
| Promotions | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| Advertising - (.0025% Total Sales) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| Google Paid Search (.010% Total Sales) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| **Total Promotions** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **-** |
| TX Franchise Tax (.00375) | $ 151 | $ 176 | $ 206 | $ 232 | $ 257 | $ 282 | $ 308 | $ 333 | $ 358 | $ 383 | $ 409 | $ 434 | $ 3,529 |
| State | | | | | | | | | | | | | $ - |
| **Total Taxes** | **$ 151** | **$ 176** | **$ 206** | **$ 232** | **$ 257** | **$ 282** | **$ 308** | **$ 333** | **$ 358** | **$ 383** | **$ 409** | **$ 434** | **3,529** |
| Business Meals & Entertainment | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 6,000 |
| General Travel | | | | | | | | | | | | | $ - |
| **Total Travel & Entertainment** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **$ 500** | **6,000** |
| **Total Expenses** | **$ 16,675** | **$ 16,700** | **$ 17,780** | **$ 17,755** | **$ 18,780** | **$ 18,856** | **$ 19,831** | **$ 19,856** | **$ 19,932** | **$ 19,907** | **$ 19,932** | **$ 20,008** | **226,012** |
| **Net Operating Income** | **$ (400)** | **$ 2,380** | **$ 4,730** | **$ 7,560** | **$ 9,340** | **$ 12,069** | **$ 13,899** | **$ 16,679** | **$ 19,408** | **$ 22,238** | **$ 25,018** | **$ 27,747** | **160,668** |
| **Sales & Executive Expenses** | | | | | | | | | | | | | |
| Sales Salary ($4,000) and 2% Commission | $ 8,000 | $ 5,974 | $ 6,310 | $ 6,594 | $ 6,877 | $ 7,161 | $ 7,444 | $ 7,728 | $ 8,011 | $ 8,295 | $ 8,578 | $ 8,862 | $ 89,832 |
| CEO Salary ($1,000) and 2% of Sales | $ 1,000 | $ 2,974 | $ 3,310 | $ 3,594 | $ 3,877 | $ 4,161 | $ 4,444 | $ 4,728 | $ 5,011 | $ 5,295 | $ 5,578 | $ 5,862 | $ 49,832 |
| **Total Other Expenses** | **$ 9,000** | **$ 8,948** | **$ 9,620** | **$ 10,187** | **$ 10,754** | **$ 11,321** | **$ 11,888** | **$ 12,455** | **$ 13,022** | **$ 13,589** | **$ 14,156** | **$ 14,723** | **139,663** |
| **Net Income** | **$ (9,400)** | **$ (6,568)** | **$ (4,890)** | **$ (2,627)** | **$ (1,414)** | **$ 748** | **$ 2,011** | **$ 4,224** | **$ 6,386** | **$ 8,649** | **$ 10,862** | **$ 13,024** | **21,005** |
| Capital Investment | | $ 35,000 | | | | | | | | | | | |
| **Bank Balance (Beg. $41,565.45)** | **$ 32,166** | **$ 60,598** | **$ 55,708** | **$ 53,081** | **$ 51,667** | **$ 52,415** | **$ 54,426** | **$ 58,650** | **$ 65,036** | **$ 73,685** | **$ 84,546** | **$ 97,571** | |
| **Capital Investment** | | | | | | | | | | | | | |

| Headcount | Sales | Executive | G&A | Dev. |
|---|---|---|---|---|
| | 1.00 | 1.00 | 0.50 | 1.00 |

| 2025 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| **Sales** | | | | | | | | | | | | | |
| Dumpster Rental | $ 20,000 | $ 24,000 | $ 28,000 | $ 32,000 | $ 36,000 | $ 40,000 | $ 44,000 | $ 48,000 | $ 52,000 | $ 56,000 | $ 60,000 | $ 64,000 | $ 504,000 |
| Junk | $ 31,000 | $ 35,000 | $ 39,000 | $ 43,000 | $ 47,000 | $ 51,000 | $ 55,000 | $ 59,000 | $ 63,000 | $ 67,000 | $ 71,000 | $ 75,000 | $ 636,000 |
| Portable Toilets & Hand Washing Stations | $ 9,500 | $ 10,500 | $ 11,500 | $ 12,500 | $ 13,500 | $ 14,500 | $ 15,500 | $ 16,500 | $ 17,500 | $ 18,500 | $ 19,500 | $ 20,500 | $ 180,000 |
| Recurring Business Service | $ 190,000 | $ 200,000 | $ 210,000 | $ 220,000 | $ 230,000 | $ 240,000 | $ 250,000 | $ 260,000 | $ 270,000 | $ 280,000 | $ 290,000 | $ 300,000 | $ 2,940,000 |
| **Total Sales** | **$ 250,500** | **$ 269,500** | **$ 288,500** | **$ 307,500** | **$ 326,500** | **$ 345,500** | **$ 364,500** | **$ 383,500** | **$ 402,500** | **$ 421,500** | **$ 440,500** | **$ 459,500** | **$ 4,260,000** |
| | **$ 250,500** | **$ 269,500** | **$ 288,500** | **$ 307,500** | **$ 326,500** | **$ 345,500** | **$ 364,500** | **$ 383,500** | **$ 402,500** | **$ 421,500** | **$ 440,500** | **$ 459,500** | **$ 4,260,000** |
| | | | | | | | | | | | | | |
| **Platform Service Fee** | $ 12,525 | $ 13,475 | $ 14,425 | $ 15,375 | $ 16,325 | $ 17,275 | $ 18,225 | $ 19,175 | $ 20,125 | $ 21,075 | $ 22,025 | $ 22,975 | $ 213,000 |
| **Total Sales + Platform Fee** | **$ 263,025** | **$ 282,975** | **$ 302,925** | **$ 322,875** | **$ 342,825** | **$ 362,775** | **$ 382,725** | **$ 402,675** | **$ 422,625** | **$ 442,575** | **$ 462,525** | **$ 482,475** | **$ 4,473,000** |
| | | | | | | | | | | | | | |
| **Cost of Goods Sold** | | | | | | | | | | | | | |
| **Purchases - COS** | | | | | | | | | | | | | |
| Dumpster Rental | $ 17,400 | $ 20,880 | $ 24,360 | $ 27,840 | $ 31,320 | $ 34,800 | $ 38,280 | $ 41,760 | $ 45,240 | $ 48,720 | $ 52,200 | $ 55,680 | $ 438,480 |
| Junk | $ 25,420 | $ 28,700 | $ 31,980 | $ 35,260 | $ 38,540 | $ 41,820 | $ 45,100 | $ 48,380 | $ 51,660 | $ 54,940 | $ 58,220 | $ 61,500 | $ 521,520 |
| Portable Toilets & Hand Washing Stations | $ 7,600 | $ 8,400 | $ 9,200 | $ 10,000 | $ 10,800 | $ 11,600 | $ 12,400 | $ 13,200 | $ 14,000 | $ 14,800 | $ 15,600 | $ 16,400 | $ 144,000 |
| Recurring Business Service | $ 161,500 | $ 170,000 | $ 178,500 | $ 187,000 | $ 195,500 | $ 202,500 | $ 212,500 | $ 221,000 | $ 229,500 | $ 238,000 | $ 246,500 | $ 255,000 | $ 2,497,500 |
| Cost of Goods Sold | $ 211,920 | $ 227,980 | $ 244,040 | $ 260,100 | $ 276,160 | $ 290,720 | $ 308,280 | $ 324,340 | $ 340,400 | $ 356,460 | $ 372,520 | $ 388,580 | $ 3,601,500 |
| **Total Cost of Goods Sold** | **$ 211,920** | **$ 227,980** | **$ 244,040** | **$ 260,100** | **$ 276,160** | **$ 290,720** | **$ 308,280** | **$ 324,340** | **$ 340,400** | **$ 356,460** | **$ 372,520** | **$ 388,580** | **$ 3,601,500** |
| **Gross Profit** | **$ 51,105** | **$ 54,995** | **$ 58,885** | **$ 62,775** | **$ 66,665** | **$ 72,055** | **$ 74,445** | **$ 78,335** | **$ 82,225** | **$ 86,115** | **$ 90,005** | **$ 93,895** | **$ 871,500** |

| Expenses | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Administration | | | | | | | | | | | | | $ - |
| Supplies | $ - | $ - | $ 100 | $ - | $ - | $ 100 | $ - | $ - | $ 100 | $ - | $ - | $ 100 | $ 400 |
| Cell Phones & Internet (7 heads) | $ 105 | $ 105 | $ 105 | $ 105 | $ 105 | $ 105 | $ 105 | $ 105 | $ 105 | $ 105 | $ 105 | $ 105 | $ 1,260 |
| Financial Software | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 3,262 |
| Health Insurance (7 heads) | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 42,000 |
| Insurance | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 892 |
| **Professional Fees** | | | | | | | | | | | | | |
| 1099 Contractors | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 12,000 |
| Accounting/CPA | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 12,000 |
| Legal | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 12,000 |
| **Total Professional Fees** | $ 6,951 | $ 6,951 | $ 7,051 | $ 6,951 | $ 6,951 | $ 7,051 | $ 6,951 | $ 6,951 | $ 7,051 | $ 6,951 | $ 6,951 | $ 7,051 | $ 83,814 |
| **Total Administration** | $ 6,951 | $ 6,951 | $ 7,051 | $ 6,951 | $ 6,951 | $ 7,051 | $ 6,951 | $ 6,951 | $ 7,051 | $ 6,951 | $ 6,951 | $ 7,051 | $ 83,814 |
| Bank & Finance Charges | | | | | | | | | | | | | |
| Bank Service Charges | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 600 |
| Finance Charges | | | | | | | | | | | | | $ - |
| **Total Interest Expense** | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 600 |
| QuickBooks Payments Fees | | | | | | | | | | | | | |
| Stripe Fees | $ 8,016 | $ 8,624 | $ 9,232 | $ 9,840 | $ 10,448 | $ 11,056 | $ 11,664 | $ 12,272 | $ 12,880 | $ 13,488 | $ 14,096 | $ 14,704 | $ 136,320 |
| Stripe Fees Passed to Customer | $ (8,016) | $ (8,624) | $ (9,232) | $ (9,840) | $ (10,448) | $ (11,056) | $ (11,664) | $ (12,272) | $ (12,880) | $ (13,488) | $ (14,096) | $ (14,704) | $ (136,320) |
| **Total Bank & Finance Charges** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| General Expenses | | | | | | | | | | | | | $ - |
| Software | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 24,000 |
| **Total General Expenses** | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 24,000 |
| Miscellaneous Expense | | | | | | | | | | | | | $ - |
| Payroll Expenses | | | | | | | | | | | | | $ - |
| **Sales Tax Plan Repayment** | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 28,775 |
| Employee Wages W2 (non sales) | $ 16,500 | $ 22,500 | $ 22,500 | $ 22,500 | $ 22,500 | $ 22,500 | $ 22,500 | $ 22,500 | $ 22,500 | $ 22,500 | $ 22,500 | $ 22,500 | $ 264,000 |
| **Total Payroll Expenses** | $ 18,898 | $ 24,898 | $ 24,898 | $ 24,898 | $ 24,898 | $ 24,898 | $ 24,898 | $ 24,898 | $ 24,898 | $ 24,898 | $ 24,898 | $ 24,898 | $ 292,775 |
| Promotions | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| Advertising - (0.5% Total Sales) | $ 376 | $ 404 | $ 433 | $ 461 | $ 490 | $ 518 | $ 547 | $ 575 | $ 604 | $ 632 | $ 661 | $ 689 | $ 6,390 |
| Google Paid Search (1.5% Total Sales) | $ 3,758 | $ 4,043 | $ 4,328 | $ 4,613 | $ 4,898 | $ 5,183 | $ 5,468 | $ 5,753 | $ 6,038 | $ 6,323 | $ 6,608 | $ 6,893 | $ 63,900 |
| **Total Promotions** | $ 4,133 | $ 4,447 | $ 4,760 | $ 5,074 | $ 5,387 | $ 5,701 | $ 6,014 | $ 6,328 | $ 6,641 | $ 6,955 | $ 7,268 | $ 7,582 | $ 70,290 |
| Franchise Taxes | $ 939 | $ 1,011 | $ 1,082 | $ 1,153 | $ 1,224 | $ 1,296 | $ 1,367 | $ 1,438 | $ 1,509 | $ 1,581 | $ 1,652 | $ 1,723 | $ 15,975 |
| State | | | | | | | | | | | | | $ - |
| **Total Taxes** | $ 939 | $ 1,011 | $ 1,082 | $ 1,153 | $ 1,224 | $ 1,296 | $ 1,367 | $ 1,438 | $ 1,509 | $ 1,581 | $ 1,652 | $ 1,723 | $ 15,975 |
| Travel & Entertainment | $ 250 | $ 250 | $ 250 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 5,250 |
| Business Meals & Entertainment | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 12,000 |
| General Travel | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Travel & Entertainment** | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 17,250 |
| **Total Expenses** | $ 34,222 | $ 40,606 | $ 41,091 | $ 41,626 | $ 42,011 | $ 42,495 | $ 42,780 | $ 43,165 | $ 43,650 | $ 43,934 | $ 44,319 | $ 44,804 | $ 504,704 |
| **Net Operating Income** | $ 16,883 | $ 14,389 | $ 17,794 | $ 21,149 | $ 24,654 | $ 29,560 | $ 31,665 | $ 35,170 | $ 38,575 | $ 42,181 | $ 45,686 | $ 49,091 | $ 366,796 |
| Sales & Executive Expenses | | | | | | | | | | | | | |
| Sales salary ($12,000) and a 2% Commission | $ 17,261 | $ 17,660 | $ 18,059 | $ 18,458 | $ 18,857 | $ 19,256 | $ 19,655 | $ 20,054 | $ 20,453 | $ 20,852 | $ 21,251 | $ 21,650 | $ 233,460 |
| CEO Salary ($2,000) and a 2% Commission | $ 7,261 | $ 7,660 | $ 8,059 | $ 8,458 | $ 8,857 | $ 9,256 | $ 9,655 | $ 10,054 | $ 10,452 | $ 10,852 | $ 11,251 | $ 11,650 | $ 113,460 |
| **Total Other Expenses** | $ 24,521 | $ 25,319 | $ 26,117 | $ 26,915 | $ 27,713 | $ 28,511 | $ 29,309 | $ 30,107 | $ 30,905 | $ 31,703 | $ 32,501 | $ 33,299 | $ 346,920 |
| **Net Income** | $ (7,638) | $ (10,930) | $ (8,323) | $ (5,766) | $ (3,059) | $ 1,049 | $ 2,356 | $ 5,063 | $ 7,670 | $ 10,478 | $ 13,185 | $ 15,792 | $ 19,876 |
| | | | | | | | | | | | | | |
| **Starting Bank Balance   $97,570.68** | $89,933 | $79,002 | $70,679 | $64,913 | $61,854 | $62,903 | $65,259 | $70,322 | $77,992 | $88,469 | $101,654 | $117,446 | |

| Headcount | Sales | Executive | G&A | Dev. |
|---|---|---|---|---|
| | 3.00 | 1.00 | 1.00 | 3.00 |

| 2026 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | |
| Dumpster Rental | $ 69,000 | $ 74,000 | $ 79,000 | $ 84,000 | $ 89,000 | $ 94,000 | $ 99,000 | $ 104,000 | $ 109,000 | $ 114,000 | $ 119,000 | $ 124,000 | $1,158,000 |
| Junk | $ 80,000 | $ 85,000 | $ 90,000 | $ 95,000 | $ 100,000 | $ 105,000 | $ 110,000 | $ 115,000 | $ 120,000 | $ 125,000 | $ 130,000 | $ 135,000 | $1,290,000 |
| Portable Toilets & Hand Washing Stations | $ 22,500 | $ 24,500 | $ 26,500 | $ 28,500 | $ 30,500 | $ 32,500 | $ 34,500 | $ 36,500 | $ 38,500 | $ 40,500 | $ 42,500 | $ 44,500 | $ 402,000 |
| Recurring Business Service | $ 310,000 | $ 320,000 | $ 330,000 | $ 340,000 | $ 350,000 | $ 360,000 | $ 370,000 | $ 380,000 | $ 390,000 | $ 400,000 | $ 410,000 | $ 420,000 | $4,380,000 |
| **Total Sales** | **$ 481,500** | **$ 503,500** | **$ 525,500** | **$ 547,500** | **$ 569,500** | **$ 591,500** | **$ 613,500** | **$ 635,500** | **$ 657,500** | **$ 679,500** | **$ 701,500** | **$ 723,500** | **$7,230,000** |
| | $ 481,500 | $ 503,500 | $ 525,500 | $ 547,500 | $ 569,500 | $ 591,500 | $ 613,500 | $ 635,500 | $ 657,500 | $ 679,500 | $ 701,500 | $ 723,500 | $7,230,000 |
| | | | | | | | | | | | | | |
| **Platform Service Fee** | $ 24,075 | $ 25,175 | $ 26,275 | $ 27,375 | $ 28,475 | $ 29,575 | $ 30,675 | $ 31,775 | $ 32,875 | $ 33,975 | $ 35,075 | $ 36,175 | $ 361,500 |
| **Total Sales + Platform Fee** | **$ 505,575** | **$ 528,675** | **$ 551,775** | **$ 574,875** | **$ 597,975** | **$ 621,075** | **$ 644,175** | **$ 667,275** | **$ 690,375** | **$ 713,475** | **$ 736,575** | **$ 759,675** | **$7,591,500** |
| | | | | | | | | | | | | | |
| **Cost of Goods Sold** | | | | | | | | | | | | | |
| **Purchases - COS** | | | | | | | | | | | | | |
| Dumpster Rental | $ 60,030 | $ 64,380 | $ 68,730 | $ 73,080 | $ 77,430 | $ 81,780 | $ 86,130 | $ 90,480 | $ 94,830 | $ 99,180 | $ 103,530 | $ 107,880 | $1,007,460 |
| Junk | $ 65,600 | $ 69,700 | $ 73,800 | $ 77,900 | $ 82,000 | $ 86,100 | $ 90,200 | $ 94,300 | $ 98,400 | $ 102,500 | $ 106,600 | $ 110,700 | $1,057,800 |
| Portable Toilets & Hand Washing Stations | $ 18,000 | $ 19,600 | $ 21,200 | $ 22,800 | $ 24,400 | $ 26,000 | $ 27,600 | $ 29,200 | $ 30,800 | $ 32,400 | $ 34,000 | $ 35,600 | $ 321,600 |
| Recurring Business Service | $ 263,500 | $ 272,000 | $ 280,500 | $ 289,000 | $ 297,500 | $ 304,500 | $ 314,500 | $ 323,000 | $ 331,500 | $ 340,000 | $ 348,500 | $ 357,000 | $3,721,500 |
| Cost of Goods Sold | $ 407,130 | $ 425,680 | $ 444,230 | $ 462,780 | $ 481,330 | $ 498,380 | $ 518,430 | $ 536,980 | $ 555,530 | $ 574,080 | $ 592,630 | $ 611,180 | $6,108,360 |
| **Total Cost of Goods Sold** | **$ 407,130** | **$ 425,680** | **$ 444,230** | **$ 462,780** | **$ 481,330** | **$ 498,380** | **$ 518,430** | **$ 536,980** | **$ 555,530** | **$ 574,080** | **$ 592,630** | **$ 611,180** | **$6,108,360** |
| **Gross Profit** | **$ 98,445** | **$ 102,995** | **$ 107,545** | **$ 112,095** | **$ 116,645** | **$ 122,695** | **$ 125,745** | **$ 130,295** | **$ 134,845** | **$ 139,395** | **$ 143,945** | **$ 148,495** | **$1,483,140** |

| Expenses | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Administration | | | | | | | | | | | | | $ - |
| Supplies | $ - | $ - | $ 100 | $ - | $ - | $ 100 | $ - | $ - | $ 100 | $ - | $ - | $ 100 | $ - |
| Cell Phones & Internet (9 heads) | $ 135 | $ 135 | $ 135 | $ 135 | $ 135 | $ 135 | $ 135 | $ 135 | $ 135 | $ 135 | $ 135 | $ 135 | $ 1,620 |
| Financial Software | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 272 | $ 3,262 |
| Health Insurance (9 heads) | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 60,000 |
| Insurance | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 74 | $ 892 |
| Professional Fees | | | | | | | | | | | | | |
| 1099 Contractors | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 12,000 |
| Accounting/CPA | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 12,000 |
| Legal | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 12,000 |
| **Total Professional Fees** | $ 8,481 | $ 8,481 | $ 8,581 | $ 8,481 | $ 8,481 | $ 8,581 | $ 8,481 | $ 8,481 | $ 8,581 | $ 8,481 | $ 8,481 | $ 8,581 | $ 102,174 |
| **Total Administration** | $ 8,481 | $ 8,481 | $ 8,581 | $ 8,481 | $ 8,481 | $ 8,581 | $ 8,481 | $ 8,481 | $ 8,581 | $ 8,481 | $ 8,481 | $ 8,581 | $ 102,174 |
| Bank & Finance Charges | | | | | | | | | | | | | $ - |
| Bank Service Charges | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 600 |
| Finance Charges | | | | | | | | | | | | | $ - |
| **Total Interest Expense** | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 600 |
| QuickBooks Payments Fees | | | | | | | | | | | | | $ - |
| Stripe Fees | $ 15,408 | $ 16,112 | $ 16,816 | $ 17,520 | $ 18,224 | $ 18,928 | $ 19,632 | $ 20,336 | $ 21,040 | $ 21,744 | $ 22,448 | $ 23,152 | $ 231,360 |
| Stripe Fees Passed to Customer | $ (15,408) | $ (16,112) | $ (16,816) | $ (17,520) | $ (18,224) | $ (18,928) | $ (19,632) | $ (20,336) | $ (21,040) | $ (21,744) | $ (22,448) | $ (23,152) | $ 261,888 |
| **Total Bank & Finance Charges** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| General Expenses | | | | | | | | | | | | | $ - |
| Software | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 24,000 |
| **Total General Expenses** | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 24,000 |
| Miscellaneous Expense | | | | | | | | | | | | | |
| Payroll Expenses | | | | | | | | | | | | | $ - |
| Sales Tax Plan Repayment | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 2,398 | $ 28,775 |
| Employee Wages W2 (non sales) | $ 31,000 | $ 31,000 | $ 31,000 | $ 31,000 | $ 37,000 | $ 37,000 | $ 37,000 | $ 37,000 | $ 37,000 | $ 37,000 | $ 37,000 | $ 37,000 | $ 420,000 |
| **Total Payroll Expenses** | $ 33,398 | $ 33,398 | $ 33,398 | $ 33,398 | $ 39,398 | $ 39,398 | $ 39,398 | $ 39,398 | $ 39,398 | $ 39,398 | $ 39,398 | $ 39,398 | $ 448,775 |
| Promotions | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Advertising - (.5% Total Sales) | $ 2,408 | $ 2,518 | $ 2,628 | $ 2,738 | $ 2,848 | $ 2,958 | $ 3,068 | $ 3,178 | $ 3,288 | $ 3,398 | $ 3,508 | $ 3,618 | $ 36,150 |
| Google Paid Search (2% Total Sales) | $ 9,630 | $ 10,070 | $ 10,510 | $ 10,950 | $ 11,390 | $ 11,830 | $ 12,270 | $ 12,710 | $ 13,150 | $ 13,590 | $ 14,030 | $ 14,470 | $ 144,600 |
| **Total Promotions** | $ 12,038 | $ 12,588 | $ 13,138 | $ 13,688 | $ 14,238 | $ 14,788 | $ 15,338 | $ 15,888 | $ 16,438 | $ 16,988 | $ 17,538 | $ 18,088 | $ 180,750 |
| Franchise Taxes | $ 1,806 | $ 1,888 | $ 1,971 | $ 2,053 | $ 2,136 | $ 2,218 | $ 2,301 | $ 2,383 | $ 2,466 | $ 2,548 | $ 2,631 | $ 2,713 | $ 27,113 |
| State | | | | | | | | | | | | | $ - |
| **Total Taxes** | $ 1,806 | $ 1,888 | $ 1,971 | $ 2,053 | $ 2,136 | $ 2,218 | $ 2,301 | $ 2,383 | $ 2,466 | $ 2,548 | $ 2,631 | $ 2,713 | $ 27,113 |
| Travel & Entertainment | $ 2,000 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 3,000 | $ 3,000 | $ 3,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 35,500 |
| Business Meals & Entertainment | $ 2,000 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 3,000 | $ 3,000 | $ 3,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 35,500 |
| General Travel | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Travel & Entertainment** | $ 4,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 71,000 |
| **Total Expenses** | $ 61,772 | $ 63,405 | $ 64,137 | $ 64,670 | $ 71,302 | $ 72,035 | $ 73,567 | $ 74,200 | $ 74,932 | $ 77,465 | $ 78,097 | $ 78,830 | $ 854,412 |
| **Net Operating Income** | $ 36,673 | $ 39,590 | $ 43,408 | $ 47,425 | $ 45,343 | $ 50,660 | $ 52,178 | $ 56,095 | $ 59,913 | $ 61,930 | $ 65,848 | $ 69,665 | $ 628,728 |
| Sales & Executive Expenses | | | | | | | | | | | | | |
| Sales salary ($20,000) and 2% Commission | $ 30,112 | $ 30,574 | $ 31,036 | $ 31,498 | $ 31,960 | $ 32,422 | $ 32,884 | $ 33,346 | $ 33,808 | $ 34,270 | $ 34,732 | $ 35,194 | $ 391,830 |
| CEO Salary ($5,000) and 2% Commission | $ 15,112 | $ 15,574 | $ 16,036 | $ 16,498 | $ 16,960 | $ 17,422 | $ 17,884 | $ 18,346 | $ 18,808 | $ 19,270 | $ 19,732 | $ 20,194 | $ 211,830 |
| **Total Other Expenses** | $ 45,223 | $ 46,147 | $ 47,071 | $ 47,995 | $ 48,919 | $ 49,843 | $ 50,767 | $ 51,691 | $ 52,615 | $ 53,539 | $ 54,463 | $ 55,387 | $ 603,660 |
| **Net Income** | $ (8,550) | $ (6,557) | $ (3,663) | $ (570) | $ (3,576) | $ 817 | $ 1,411 | $ 4,404 | $ 7,298 | $ 8,391 | $ 11,385 | $ 14,278 | $ 25,068 |
| | | | | | | | | | | | | | |
| **Starting Bank Balance $117,446.24** | $108,896 | $102,339 | $98,676 | $98,106 | $94,530 | $95,347 | $96,758 | $101,162 | $108,460 | $116,851 | $128,236 | $142,514 | |

| Headcount | Sales | Executive | G&A | Dev. |
|---|---|---|---|---|
| | 5.00 | 1.00 | 1.00 | 5.00 |

## ADDENDUM 3
## RIGHTS OFFERING LETTER

## RIGHTS OFFERING PARTICIPATION NOTICE

To: WastePlace, LLC
c/o Justin Mertz
790 N. Water Street, Ste. 2500
Milwaukee, WI 53202
Email:  jmmertz@michaelbest.com

The undersigned is a Holder of Allowed Equity Interests in WastePlace, LLC (the "**Company**"). The Company has proposed a Plan of Reorganization (modified as of December 8, 2023) (the "**Plan**") for approval by the Bankruptcy Court in the Western District of Texas in Case No. 23-10768-smr. By delivering this completed, signed, and dated Notice, the Holder elects to participate in the Rights Offering as further defined and set forth in Section 4.5(a) the Plan, which states in part:

> *Rights Offering*. Through the Plan, Holders of Allowed Equity Interests are requested and authorized to pay into the Reorganized Debtor additional investments in exchange for Class C Units in the Reorganized Debtor. The Plan Proponent suggests that a minimum contribution should be no less than 10% of such Equity Interest Holder's original capital contribution. In exchange for such investment, Holders that participate will receive approximately 17.32 Class C Units in the Reorganized Debtor for every $1.00 invested.

NOW, THEREFORE:

1.   The undersigned Holder elects to purchase Class C Units pursuant to the Rights Offering set forth in the Plan, as may be amended.

2.   Provided the Plan is confirmed, the Holder agrees to contribute $_____ by the Contribution Date (defined in the Plan), in exchange for the corresponding amount of Class C Units. Upon receipt of the funds, the Company shall deliver to the Holder the number of Class C Units that correspond with the contribution amount.

## ALLOWED EQUITY INTEREST HOLDER

By:  _____ (sign)

Name:_____ (print)

Date:  _____

## ADDENDUM 4
## ASSUMED & REJECTED EXECUTORY CONTRACTS

| Counterparty | Assumed/Rejected | Potential Cure Amount | Cure Amount to Pay |
|---|---|---|---|
| A Fresh Start Moving and Junk Removal, LLC | Assumed | $ - | $ - |
| A Spotless House Cleaning (Kevin Smith) | Assumed | $ - | $ - |
| Aardvark Disposal Service | Assumed | $ - | $ - |
| Al's Rubbish and Container Service, Inc. | Assumed | $ - | $ - |
| Athens Services, Inc | Assumed | $ - | $ - |
| ATX-JUNK-A-HAULICS | Rejected | $ 160.00 | |
| Austin Dumpster Service, LLC | Assumed | $ - | $ - |
| Balcones Recycling, Inc. | Rejected | $ 108,866.01 | |
| Break it Down | Rejected | $ 11,674.00 | |
| C6 Disposal Systems, Inc. | Assumed | $ - | $ - |
| Cavossa Disposal Corporation | Assumed | $ 749.79 | $ 749.79 |
| Central Texas Refuse, LLC  (CTR) | Rejected | $ 25,810.13 | |
| City Waste LP (Coastal Compaction) | Rejected | $ 18,394.32 | |
| Clark Hill Strasburger | Rejected | N/A | |
| Falcone Enterprises | Assumed | $ - | $ - |
| Frontier Waste (Capstone - 8642 Oakland *only*) | Assumed | $ 2,488.00 | $ 2,488.00 |
| Frontier Waste - all other contracts | Rejected | - | |
| GFL Environmental | Rejected | $ 2,877.21 | |
| Gone for Good Dumpsters, LLC | Assumed | $ - | $ - |
| Grime Time, LLC | Rejected | $ 25,805.87 | |
| Houston Waste Services | Rejected | $ 9,301.37 | |
| HTX Junk-A-Haulics | Assumed | $ - | $ - |
| Jet-A-Way Waste Services - (JAW Waste) | Terminated | N/A | |
| Joe's Organics LLC | Assumed | $ - | $ - |
| K Town Disposal, LLC | Assumed | $ - | $ - |
| Keter Environmental, Inc | Assumed | $ - | $ - |
| Lonestar Essential Services, LLC | Assumed | $ - | $ - |
| Maher Removal and Disposal, Inc | Assumed | $ - | $ - |
| Mass Junk, Inc. | Rejected | $ 8,746.50 | |
| McEachern Enterprises, Inc DBA Superior Septic | Assumed | $ - | $ - |
| McGinnis Lochridge | Rejected | N/A | |
| Meicher CPAs, LLP | Assumed | $ - | $ - |
| Recon Services Inc - (973 Materials) | Assumed | $ - | $ - |
| redbox+ of Central Texas | Assumed | $ - | $ - |
| Republic Services | Rejected | $ 32,793.25 | |
| Rhino Removal | Assumed | $ 135.14 | $ 135.14 |
| Salsamobi LLC | Assumed | $ - | $ - |
| South Shore Disposal, Inc | Assumed | $ 324.88 | $ 324.88 |
| Southwest Abatement | Assumed | $ - | $ - |
| Superior Disposal LLC | Rejected | $ 18,220.16 | |
| Supreme Junk Removal | Assumed | $ - | $ - |
| Texas Disposal Systems (TDS) | Rejected | $ 7,154.63 | |
| The Junkluggers of Austin | Assumed | $ - | $ - |
| Tri-Recycling Inc | Assumed | $ 3,236.80 | $ 3,236.80 |
| Waste Connections, Inc. (all contracts) | Assumed | $ 1,979.69 | $ 1,979.69 |
| WM - Waste Management, Inc | Assumed | $ - | $ - |
| **TOTAL** | | **$ 278,717.75** | **$ 8,914.30** |